**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| **DANIEL MASTERS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 09 C 3617** |
| **v.** | ) | |
| | ) | **Magistrate Judge Jeffrey Cole** |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Daniel Masters seeks review of the final decision of the Commissioner of the Social Security Administration, denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 423(d)(2), and Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. §1382c(a)(3)(A). Mr. Masters asks the court to reverse the Commissioner's decision, while the Commissioner seeks an order affirming it. In the alternative, Mr. Masters asks that the case be remanded to the Commissioner.

## I.
## THE PROCEDURAL HISTORY OF THE CASE

Mr. Masters applied for DIB and SSI on December 17, 2004, alleging that he had been disabled since March 6, 2001. (Administrative Record ("R.") 63). When his application was denied initially and upon reconsideration, Mr. Masters requested an administrative hearing. An Administrative Law Judge ("ALJ") convened a hearing at which Mr. Masters, represented by counsel, appeared and testified. (R. 532). On June 12,

2007, the ALJ found that Mr. Masters was not disabled because he had no exertional limitations, and his non-exertional limitations did not preclude him from performing his past work as a machine helper. (R 56-62). Mr. Masters filed a request for review, which the Appeals Council granted, remanding the case to the ALJ. The Appeals Council instructed the ALJ to assess Mr. Masters' work history because it appeared his machine helper job was not past relevant work, to take testimony from a vocational expert ("VE"), and, if Mr. Masters were found disabled, to consider whether drug addiction or alcoholism were involved. (R. 75-76).

The ALJ held a second hearing on April 29, 2008, at which Ed Pagella testified as a vocational expert, and Dr. Marva Dawkins testified as a medical expert. (R. 556-590). On November 17, 2008, the ALJ issued a second unfavorable decision in which she found that Mr. Masters was not disabled because he could perform jobs that exist in significant numbers in the national economy. (R. 18-29). This became the final decision of the Commissioner when the Appeals Council denied Mr. Masters' request for review on April 22, 2009. (R. 6-8). *See* 20 C.F.R. §§ 404.955; 404.981. Mr. Masters has appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c).

2

## II.
## THE EVIDENCE

### A.
### The Vocational Evidence

Mr. Masters was born on June 3, 1961, making him forty-seven years old at the time of the ALJ's decision. (R. 154).  He has a high school education (R. 535) and work experience as a plumber and a carpenter. (R. 156-58, 585).  Aside from a part-time stint as a machinist's assistant, he has not worked since 2001.

### B.
### The Medical Evidence

On June 20, 2001, Mr. Masters saw Dr. Kenneth Nash in Fort Collins, Colorado, complaining of several months of "lowered mood, energy, concentration, interest, enjoyment and feelings of hopelessness and despair." (R. 348).  Mr. Masters said he also had some high-energy periods.  (R. 348).  He related his past treatment for alcoholism and a recent DUI, as well as the fact that he had been sober for several weeks.  (R. 348).  Dr. Nash diagnosed him with bipolar disorder and alcohol dependence and assigned a GAF "in the 50s." (R. 348).[1]  The doctor gave Mr. Masters some samples of Depakote and referred him to an outpatient program.  (R. 349).

Treatment notes through the beginning of August 2001 – barely legible – reveal Mr. Masters having some issues with anger, including a shouting match with his wife that led to the police being called.  Depakote dosage was decreased, and Lamictal, a seizure medication – was added to his regimen.  (R. 352).  By the end of August, Mr.

---

[1] A GAF score of 51-60 signifies moderate symptoms or moderate difficulties in social or occupational functioning.  http://en.wikipedia.org/wiki/Global_Assessment_of_Functioning.

Masters' anger was a lot better. His moods were improving through September, although he still had some episodes of depression. Improvement continued into October. (R. 351).

Things changed the following month. Although Dr. Nash felt his condition had been stable, on November 20, 2001, Mr. Masters reported he felt like his depression was returning. He said he had been sleeping 18-20 hours a day for a week. (R. 354). He had no suicidal thoughts. (R. 354). But by December 4th, Mr. Masters had not followed through with his treatment. (R. 354). On December 7th, his wife reported he was feeling suicidal. (R. 354). That same day, Mr. Masters was admitted to the local hospital with a history of depression and episodes of rage to the point of a minor assault on his wife with a TV remote control. (R. 231). His GAF upon admission was 35. (R. 232).[2] It was noted that he was on Depakote, Lithium, and Lamictal, and that he had abused drugs and alcohol until July 2001. (R. 231).

Mr. Masters participated in group therapy, slept well, and showed no manic symptoms. He and his wife had a couples session. During his hospitalization, he had no suicidal thoughts, but did get more depressed after his wife informed him she was leaving him. (R. 231). He managed to adjust to the idea and make positive future plans, including living with his family in Illinois, even though he described them as less than supportive. (R. 231, 234). Mr. Masters displayed a good memory and freedom from distractibility. He was diagnosed with a depressive disorder and alcohol dependence in

---

[2] A GAF score of 31-40 denotes major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. http://en.wikipedia.org/wiki/Global_Assessment _of_Functioning.

partial remission and a GAF of 50. (R. 231-32).[3] He had no suicidal thoughts. (R. 232). He was discharged on December 13, 2001. (R. 231).

Mr. Masters continued with his treatment the following summer at the Larimer Center for Mental Health. On June 5, 2002, Mr. Masters was diagnosed with chronic low-grade depression and assigned a GAF of 51. (R. 245). His wife left him in October of 2002, and he moved in with a friend. (R. 265). In February and March of 2003, his mood was normal, and he was generally doing well. He had some difficulty sleeping. (R. 272-73). In March he complained of being anxious, but his mood was fine and he had no manic symptoms. (R. 274). In April of 2003, his mood remained good. On April 3, 2003, Mr. Masters' mental status exam was normal – normal mood, affect, concentration, attention, and judgment. (R. 260). The diagnosis this time was bipolar disorder with a secondary finding of attention deficit hyperactivity disorder, despite the mental status findings. (R. 261). GAF was 61. (R. 261).[4] On June 3, 2003, his mental status exam was essentially within normal limits, including mood and affect. (R. 253). Mr. Masters' attention, concentration, judgment, and memory were all normal. (R. 253). The primary diagnosis was attention deficit disorder, with a secondary diagnosis of dysthymic disorder, with a GAF of 61. (R. 255).

---

[3] A GAF score of 41-50 signifies serious symptoms or any serious impairment in social, occupational, or school functioning. http://en.wikipedia.org/wiki/Global_Assessment _of_Functioning.

[4] A GAF score of 61-70 denotes some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships. http://en.wikipedia.org/wiki/Global_Assessment _of_Functioning.

5

He was jailed briefly in March 2004 when he failed to make a court date.  (R. 268).  He also started a construction job around that time.  (R. 268).  His mood was normal, and he had "no thoughts of harm."  (R. 268).  In April 2004, Mr. Masters reported that his medications were working well.  His mood was normal – he was experiencing no mood swings.  (R. 269).  On June 5, 2004, he was diagnosed with bipolar disorder with a secondary diagnosis of attention deficit/hyperactivity, and was assigned a GAF of 63.  (R. 240).  He was stable on his medications as of June 28, 2004.  (R. 270).

On September 5, 2004, Mr. Masters was hospitalized with sudden onset of "grand mal" seizures in connection with alcohol withdrawal. (R. 292).  He had been incarcerated for about 40 days in July and August.  (R. 297).  He was treated with Dilantin and, upon discharge, there were no restrictions on his activities.  (R. 292).  On December 14, 2004, Mr. Masters was  diagnosed with depression and alcohol dependence. (R. at 322).  In the interim, he had moved to Illinois to live with his parents. (R. 334).  At that time, Mr. Masters said he had been having 15-20 drinks daily for a period of 6-12 months that ended three months earlier.  (R. 332).  It was also noted that he had withdrawn from social interactions but, at the same time, that he did "well socializing with others."  (R. 334).  He said he had done well in social situations in Colorado, but had developed no close relationships yet in Illinois.  (R. 335).

On January 5, 2005, Mr. Masters went to Dr. Dan Gauthier for a checkup and said he didn't feel his Welbutrin was effective anymore.  He had been off medication for at

least two or three days and reported being more depressed. The doctor took him off Welbutrin and put him on Effexor. (R. 342-43).

On April 11, 2005, Mr. Masters had a consultative psychiatric examination with Dr. Michael Fernando, a psychiatrist, in conjunction with his claim for disability benefits. Mr. Masters described his mood as "okay." He reported to Dr. Fernando that he had been incarcerated for domestic violence on three separate occasions and that in the remote past he had used cannabis and cocaine. (R.360). Dr. Fernando noted that his facial expressions were tense at times. (R. 361). Attention, concentration, and memory were all intact, and Mr. Masters was rational, coherent, attentive and not distractible. (R. 361). Dr. Fernando found no evidence of major depression or mania "that could explain his current difficulties." (R. 362).

Mr. Masters "report[ed] significant relief of symptoms by his prescribed psychotropic regimen," which had included Ritalin, Zoloft, and Effexor. (R. 359). He told Dr. Fernando that he had been unable to maintain employment since 2001 because of depression. He said that on most days he felt anxious and that he feels overwhelmed when he has to do something. He said his concentration "isn't good," and that he has a hard time "staying focused." (R. 359). He denied feelings of hopelessness, guilt, restlessness, excessive worry, decreased need for sleep and fatigability. (R. 359). Mr. Masters said that he was receiving "group counseling." (R. 360).

Dr. Fernando concluded, based on Mr. Masters' clinical presentation, mental status examination, and available histories, that Mr. Masters' difficulties appear to be consistent with an Axis II disorder. There was no evidence, he found, of major

depression, which could explain his current difficulties. (R. 362). Dr. Fernando noted that during the evaluation Mr. Masters "seemed capable of maintaining concentration, forming a stream of ideas and exercising memory function which would correlate with an ability to maintain social contact with others in a basic work setting." (R. 362).[5] He diagnosed mood disorder and avoidant personality traits. (R. 362).

On April 15, 2005, Dr. David Brister, a psychologist, reviewed the record and prepared a Mental Residual Functional Capacity Assessment. (R. 364). He felt that Mr. Masters was *moderately* limited in the areas of ability to understand and remember detailed instructions, the ability to carry out detailed instructions, the ability to accept instructions and respond appropriately to criticism from supervisors. (R. 364-65). He concluded that Mr. Masters "should be able to maintain concentration to do simple tasks." (R. 366).

On July 20, 2005, while his application for benefits was pending with the Social Security Administration, Mr. Masters saw Dr. Steven Prinz. His one-and-a-half-page treatment note stated that Mr. Masters was seeking "treatment of his moods." There was no claim of sleeping during the day, and Mr. Masters admitted that he had not been consistent in taking the various medicines that had been prescribed for him. (R.397).

Dr. Prinz described Mr. Masters as alert, oriented to person, place, time and situation and having appropriately-related affect. He observed no homicidal or suicidal ideation. Dr. Prinz noted that Mr. Masters' mood was sad, that he could recall two of

---

[5] This conclusion was consistent with Mr. Masters' own statement four months earlier on December 14, 2004, that he had done well in social situations in Colorado. (R. 335).

three words after five minutes, and that his concentration was fair. (R. 397). Mr. Masters was without any active psychotic symptomatology. Dr. Prinz diagnosed major depression, generalized anxiety disorder, ADHD, and history of alcohol abuse. He advised that Mr. Masters follow up with an internist and with him in the next month. (R. 397-398).

On December 13, 2005, Dr. Prinz filled out a form captioned, "Mental Disorders Report," that Mr. Masters' counsel prepared and provided.[6] According to the form, Dr. Prinz had seen Mr. Masters on October 17, 2005. (R. 393). However, there is no treatment note for that meeting. In the December 13th form, Dr. Prinz diagnosed Mr. Masters with "296.3, GAD, ADHD, past ETOH [alcohol] abuse." (R. 397). He noted Mr. Masters was being treated with Zoloft and therapy. (R. 397). In the section that asked whether there were certain triggers that caused Mr. Masters' symptoms, Dr. Prinz checked literally every box, including "dealing with family," (R. 397), even though on the next page he checked the "yes" box that said that Mr. Masters was living in a highly supportive and protective setting which alleviates his symptoms. (R. 394).

Dr. Prinz said that Mr. Masters' depression and anxiety made it difficult for him to experience new things and decreased his ability to concentrate on tasks. Although the form asked for an explanation, Dr. Prinz did not provide one; he merely reiterated that Mr. Masters' illness impacted his ability to concentrate. (R. 393-396). He checked "no" to the question of whether Mr. Masters was able to function in a "*competitive* work setting (not a sheltered workshop position) on an *eight hour per day, five days per week*

---

[6] At the bottom of each page of the form appears "Jeffrey A. Rubin & Associates, Ltd."

*basis.*" (R. 394)(Emphasis supplied)(parenthesis in original). No question was asked about capacity to work in a less stressful, less demanding, basic work setting, involving simple tasks. (R. 362). Dr. Prinz checked the box "no" that asked whether Mr. Masters' medications caused side effects. (R. 394). When asked whether there were other conditions that affected Mr. Masters' ability to function, the doctor answered, curiously, "at above." (R. 394).

Dr. Prinz also filled out a check list that Mr. Masters' attorney provided, which referred to "SSA's Regulations" and asked which symptoms the doctor "ha[d] *noticed* during [his] treatment." (R. 396)(Emphasis supplied). Dr. Prinz, who had seen Mr. Masters on two occasions, checked sleep disturbance, decreased energy, difficulty concentrating, appetite disturbance, psychomotor retardation, feelings of guilt. (R. 396). Under functional limitations, he appeared to check either "marked difficulties in maintaining concentration" and "repeated episodes of decompensation" – or those two along with "marked difficulties in social functioning." (R. 396).

Mr. Masters saw Dr. Prinz one more time in November of 2007. Mr. Masters reported that he was struggling with moods, energy, and concentration. (R. 526). Dr. Prinz noted his mood was sad, judgment and insight fair, and thought processes coherent and logical. (R. 526). Mr. Masters had apparently been off medications for some time, and expressed the desire to go back on medication, and the doctor placed him on Zoloft. (R. 526).

## C.
### The Administrative Hearing Testimony

### 1.
### Mr. Masters' Testimony

At the hearing, Mr. Masters testified that he was divorced and lived with his parents. (R. 559-60). He said he had lost 10 pounds over the last year, due to a lack of appetite. (R. 559). He said he didn't sleep well at night – he "toss[ed] and turn[ed] once in a while" – and generally took an hour and a half nap during the day. (R. 562). He claimed that he had trouble remaining focused "on any one task at one time for too long," saying that he couldn't even vacuum for more than about fifteen minutes. (R. 563). He cooked for himself, did his own laundry, and did some mowing in the summer. (R. 563). He went fishing a couple times each month in good weather. (R. 563).

Under questioning by Dr. Dawkins about his daily activities, Mr. Masters said, "I don't do a whole lot." (R.566). Later, he said that he got tired very easily, but didn't know why, because he didn't do much. He first said he watches "a lot of TV," but then said "not a whole lot, I get tired real easy." (R. 568). He was able to drive, but his license was revoked (R. 569), so his mother drove him where he needed to go. (R. 571). Mr. Masters said he socialized with his family and went to AA meetings twice a week. (R. 564). He has not had a drink since December 2007 – the hearing was in April 2008 – when his father passed away. (R. 564).

He last saw a mental health professional in November 2007, when he went to Dr. Prinz. (R. 565). Mr. Masters said he saw Dr. Prinz on just that one occasion, when the doctor gave him Zoloft. (R. 565). He quit taking it "after a few months because it wasn't

doing anything," and it was too expensive. (R. 565). Dr. Dawkins expressed some confusion about the reasons for the cessation of medicine a few months after seeing Dr. Prinz in December 2005, and pointedly asked: "Well, now, now I'm confused here. So you stopped, you stopped the medicine because you couldn't afford it or you stopped the medicine because it wasn't helping?" Mr. Masters responded: "It wasn't helping at all and I've taken numerous depression medications and nothing seems to be working or has worked in the past." (R. 573). This assertion was contrary to numerous statements by Mr. Masters to various doctors as reflected in the medical records, that his medicines were helpful when he took them.[7]

There then occurred this question by Mr. Masters' counsel, which was at once leading and distorted Mr. Masters' answer: "And just one other item to clear up Dr. Dawkins' confusion. It seems like you – is it fair to say that you stopped taking the medications for two reasons. Because you couldn't afford them and because they didn't help you out much?" To which Mr. Masters responded: "Yeah, I would say that. Yeah." (R. 574-575). Nothing in any medical records or the notes of the weekly group therapy sessions Mr. Masters regularly attended (R. 503-521; 568) supported cost as playing any role in Mr. Masters' intermittent compliance with the prescribed medical regimen.

When he first moved in with his parents, he worked for perhaps 8 months in 2005 and 2006 in production work, which was exceedingly demanding and involved production quotas, which he found overwhelming. He couldn't handle the stress and had

---

[7] The contradiction between the hearing testimony and the medical records quite properly factored into the ALJ's credibility determination. *See infra* at 14-15, 28.

a hard time staying focused. (R. 567, 571). Since then he has tried to look for work, but said he did not have any motivation. (R. 567, 570).

**2.**
**The Medical Expert's Testimony**

Dr. Marva Dawkins recounted the varying diagnoses in the record – depression, bipolar disorder, ADHD by history, and history of alcohol abuse. She opined that, based on the evidence, Mr. Masters more likely suffered from depression rather than bipolar disorder. (R. 578). She thought his condition was severe, but that it did not meet the Listings. (R. 579). She went on to say that Mr. Masters didn't give a very good description of his daily activities, but she couldn't imagine he was just "sleeping all day." (R. 579). His social functioning appeared to be mildly impaired – he could interact appropriately with others – and his concentration moderately impaired. (R. 579). Contrary to Dr. Prinz's unexplained entry (checkmark) on the December 2005 form, *see supra* at 8, she said there was no evidence in the medical records of recent decompensation. (R. 579-80).

Dr. Dawkins concluded that Mr. Masters could perform simple, unskilled work where rate of production was not a factor. (R. 580). She disagreed with Dr. Prinz that Mr. Masters could not sustain focus on a job, because the context was the production job that Mr. Masters had where he had to maintain a quota and he was involved in work that requires meticulous measurements on "little tiny parts, something like a micrometer." (R. 567, 584). He was also working 10 to 12 hours a day. (R. 548).

13

### 3.
### The Vocational Expert's Testimony

Mr. Pagella then testified as a vocational expert. In response to the ALJ's hypothetical, he testified that if a person were limited to unskilled work that did not involve production quotas or work on ladders, rope, or scaffolding, that person would be able to perform several jobs that exist in significant numbers in the regional economy. Examples were: information clerk (4800 positions); messenger (1600); office cleaner (3800). (R. 586). A person who could only have occasional contact with supervisors, co-workers, or the public would not be able to perform such jobs. (R. 586). Mr. Masters' attorney then asked whether a person who had to sleep for an hour and a half in the middle of each day could perform any work. The VE – predictably – responded that there was no work that such an individual could perform. (R. 586).

### D.
### The ALJ's Decision

The ALJ found that Mr. Masters suffered from the following *severe* impairments: mood disorder, major depression, generalized anxiety disorder, ADHD, history of alcohol abuse, and alcohol-related seizure disorder. (R. 21-22). She further found that these impairments did not meet or equal a listed impairment, specifically Listing 12.04, covering affective disorders, 12.06, covering anxiety related disorders, or 12.09, covering substance abuse disorders. (R. 21).

The ALJ found that Mr. Masters had *moderate* restrictions in activities of daily living, *mild* difficulties in social functioning, and *moderate* difficulties in concentration, persistence or pace. There were no periods of decompensation for over a year. (R. 21-

14

23). In connection with her conclusion regarding Mr. Masters' possible limitations in the area of daily living, the ALJ rejected the claimant's attorney's argument and Mr. Masters' testimony that his mother had to take care of him. (R. 570). She pointed out that Dr. Dawkins' review of the medical records revealed that Mr. Masters did not claim his mother takes care of him, but rather he just does not help her with chores, even though he appears capable of doing so. She also pointed out that Mr. Masters testified at the prior hearing that he moved back home for financial reasons; he did not say that the reason for the move was that he needed to be taken care of by his parents. (R. 22).

Next, after summarizing the evidence in the medical record and discussing Mr. Masters' hearing testimony, the ALJ determined that he could perform work not involving production quotas or work on ladders, ropes or scaffolding, or more than occasional climbing of stairs and ramps due to his history of a seizure. (R. 23). She found that Mr. Masters was not entirely credible about the extent of the restrictions resulting from his impairments and explained her reasoning. (R.24-25).

The ALJ went on to say that while Mr. Masters had some limits on his ability to focus that thwarted his past production work, they would not hinder non-quota work, again pointing to the ME's testimony. (R.25). She also questioned Dr. Prinz's understanding of "marked restrictions" and his checkmark of "repeated episodes of decompensation" on the preprinted December 13, 2005 form, which was not supported by the medical records. The ALJ found the medical record did not support those unexplained conclusions/checkmarks. (R. 25).

15

The ALJ also noted that Mr. Masters testified that medications have never been efficacious. This, the ALJ quite correctly emphasized, was belied by the medical records. (R. 25). Indeed, the records are replete with evidence, including statements by Mr. Masters to his various doctors, that the medicines he took were indeed effective. (*See* discussion at R.25-26 and *supra* at 3, 5-6, 8; and *infra* at 28.). The ALJ pointed out that even Dr. Prinz's November 2007 treatment note reflected that Mr. Masters said that when on medication he did not feel so depressed. She noted that according to Dr. Dawkins, who reviewed the medical records, medication does indeed help Mr. Masters and his symptoms. (R. 25). She went on to note that Dr. Prinz had observed that Mr. Masters had been on Ritalin "with normal success," but that he had not been "consistent with his medication." (R. 26).

Ms. Golas, a social worker, observed in 2005 in a letter written in an attempt to keep Mr. Masters from having his probation violated by having moved to Illinois from Colorado that Mr. Masters' "general awareness has improved with medication." (R. 26). The ALJ noted that in an evaluation letter in October 2001, it is reported that Mr. Masters was taking medication and his mood continued to improve. (R. 26). Finally, it may be noted that in November 2007, Mr. Masters told Dr. Prinz that he "very much would like to get on medications again." (R. 526).

She found Dr. Prinz's opinion that Mr. Masters could not sustain work was unsupported by objective findings and was likely based simply on Mr. Masters' subjective complaints. (R. 25-26).

The ALJ found that Mr. Masters could not perform his past work in carpentry or at a production job. (R. 26). The ALJ then relied on the VE's testimony to find that Mr. Masters could perform certain work existing in significant numbers in the regional economy. (R. 27-28). Hence, she concluded that Mr. Masters was not disabled within the meaning of the Act. (R. 28).

## IV.
## DISCUSSION

Mr. Masters' arguments for reversal are, at bottom, a request to reweigh the evidence – which must be declined. *Ketelboeter v. Astrue,* 550 F.3d 620, 624 (7th Cir. 2008). An ALJ's credibility assessment and ultimate determination need not be perfect or ideal. *Outlaw v. Astrue,* 412 Fed.Appx. 894, 899, 2011 WL 891803, 5 (7th Cir. 2011); *Simila v. Astrue,* 573 F.3d 503, 517 (7th Cir. 2009); *Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008). So long as the former is not "patently wrong," *McKinzey v. Astrue,* 641 F.3d 884, 890 (7th Cir. 2011)*; Jones v. Astrue*, 623 F.3d 1155, 1162 (7th Cir. 2010), and the latter finds "'some support'" in the record, *Berger*, 516 F.3d at 546, an ALJ's credibility and eligibility determinations will not be disturbed, regardless of how a reviewing court might have viewed the matter were it *res integra*. Failure to adhere to this fundamental principle of judicial review would effectively shift the center of authority from the ALJ to the courts and impermissibly realign the different roles and responsibilities that Congress has allocated to the Social Security Administration and the judiciary.

## A.

### The Standards of Review

We review the ALJ's decision directly, but we play an "extremely limited" role. *Simila,* 573 F.3d at 513 -514; *Elder v. Astrue,* 529 F.3d 408, 413 (7th Cir. 2008). "We do not actually review whether [the claimant] is disabled, but whether the Secretary's finding of not disabled is supported by substantial evidence." *Lee v. Sullivan,* 988 F.2d 789, 792 (7th Cir.1993). If it is, the court must affirm the decision. 42 U.S.C. §§405(g). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Schaaf v. Astrue,* 602 F.3d 869, 874 (7th Cir. 2010).

The court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009); *Berger*, 516 F.3d at 544. Where conflicting evidence would allow reasonable minds to differ as to whether the claimant is disabled, it is the ALJ's responsibility to resolve those conflicts. *Simila,* 573 F.3d at 513 -514; *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Since conclusions of law are not entitled to such deference, where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007). While the standard of review is deferential, the court cannot "rubber stamp" the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002).

Although the ALJ need not address every piece of evidence, the ALJ cannot limit discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*,

19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the claimant a meaningful judicial review. *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009). The Seventh Circuit calls this building a "logical bridge" between the evidence and the ALJ's conclusion. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996). It is a "lax" standard. *Berger*, 516 F.3d at 545. It is enough if the ALJ "'minimally articulate[s] his or her justification for rejecting or accepting specific evidence of a disability.'" *Berger*, 516 F.3d at 545; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).

**B.**
**The Five-Step Sequential Analysis**

The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

> 1) is the plaintiff currently unemployed;
> 2) does the plaintiff have a severe impairment;
> 3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;
> 4) is the plaintiff unable to perform his past relevant work; and
> 5) is the plaintiff unable to perform any other work in the national economy?

20 C.F.R. §§ 404.1520; *Simila,* 573 F.3d at 512-13; *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. 20 C.F.R. §416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan,* 892 F.2d 43, 44 (7th Cir. 1990). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. §404.1520; *Stein*, 892 F.2d at 44. The claimant

bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352.

## C.
## Analysis

## 1.
## Introduction

"No trial is perfect." *United States v. Mazzanti*, 888 F.2d 1165 (7th Cir. 1989). And no administrate hearing or opinion is either. *See Fisher*, 869 F.2d at 1057 ("the administrative law judge's opinion is vulnerable. But that is nothing new."). Thus, in analyzing an ALJ's decision, a reviewing court is to look for "fatal gaps or contradictions" and not "nitpick" in search of an essentially meaningless misstep. *Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir. 2010); *Jones*, 623 F.3d at 1160; *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000).

A number of the arguments that Mr. Masters levels against the ALJ's negative credibility assessment of him are based on the tacit assumption that his testimony and the statements he made to Dr. Prinz were true, and that the ALJ had to accept them. But, "of course, the administrative law judge did not have to believe [Mr. Masters' testimony]." *Sarchet*, 78 F.3d at 307. Social security applicants, like other witnesses, may exaggerate or lie to their doctors and to the administrative law judge. *Turner v. Astrue,* 390 Fed.Appx. 581, 585, 2010 WL 3330015, 3 (7th Cir. 2010). *Cf.*, *Dixon v. Massanari,* 270 F.3d 1171, 1178 (7th Cir. 2001)("An ALJ may properly reject a doctor's opinion if it appears to be based on a claimant's exaggerated subjective allegations."); *Johnson v. Barnhart,* 449 F.3d 804, 806 (7th Cir. 2006).

20

Administrative law judges are not inert and wooden participants in an empty ritual, the preordained end of which is to award benefits to those claiming to be in distress, regardless of whether they qualify under the Act. The purpose of a social security hearing is to enable the ALJ to determine where the truth lies and to administer the Act in conformity with Congress's carefully crafted statutory framework. Thus, an ALJ may reasonably disbelieve a claimant's testimony when, for example, it is contradicted by medical records or other medical evidence. *Ziegler v. Astrue,* 336 Fed.Appx. 563, 570 (7th Cir. 2009); *Jones,* 623 F.3d at 1161; *Getch v. Astrue,* 539 F.3d 473, 483 (7th Cir. 2008), by conduct inconsistent with the claim, by prior inconsistent statements, or other conduct or statements that tend to render the testimony doubtful. That, as we shall see, is the situation here.

An ALJ's credibility determination is reviewed with "special deference," *Castile,* 617 F.3d at 929; *Briscoe ex rel. Taylor v. Barnhart,* 425 F.3d 345, 354 (7th Cir. 2005), because the ALJ, not a reviewing court, is in the best position to evaluate credibility. *Simila,* 573 F.3d at 517; *Eichstadt v. Astrue,* 534 F.3d 663, 667-68 (7th Cir. 2008). The credibility determination need not be flawless, *Simila,* 573 F.3d at 517; *Berger v. Astrue,* 516 F.3d 539, 546 (7th Cir. 2008), and will be reversed only if is "patently wrong." *Jones,* 623 F.3d at 1162; *Simila,* 573 F.3d at 517. That occurs only when the determination is "lack[ing] any explanation or support." *Elder v. Astrue,* 529 F.3d 408 at 413-14; *Allord v. Barnhart,* 455 F.3d 818, 821 (7th Cir. 2006). Demonstrating that a credibility determination is "patently wrong" is a "high burden." *Turner v. Astrue,* 390 Fed.Appx. 581, 587, 2010 WL 3330015, 5 (7th Cir. 2010).

21

It is against this backdrop of settled principles that we turn to Mr. Masters' specific objections.

## 2.
## Mr. Masters' Objections To The ALJ's Decision

The first of the several flaws Mr. Masters finds in the ALJ's decision involves her finding that he had no significant work-related limitations in social functioning, a decision Mr. Masters contends was reached by ignoring Dr. Dawkins' testimony that he had marked limitations in activities of daily living. Mr. Masters also contends that the ALJ gave inadequate consideration to Dr. Prinz's opinion that Mr. Masters was disabled and ignored his 2007 treatment note, which he contends, was, "in effect," a reaffirmation of his conclusion that Mr. Masters met certain relevant listings. (Memorandum at 13-14).

Mr. Masters further faults the ALJ for her negative credibility assessment of him. The ALJ concluded that Mr. Masters "is not persuasive." She found that while his "medically determinable impairments could reasonably be expected to cause [his] alleged symptoms," his "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not credible to the extent that they are inconsistent with the above [RFC] assessment." (R.24). He contends that the credibility determination is wrong because it rests on a misunderstanding by the ALJ of Mr. Masters' testimony.

### a.

In addressing Mr. Masters' limitations in social functioning, the ALJ noted that, in her previous decision she found Mr. Masters *moderately* limited. (R. 22). This

22

restricted Mr. Masters to only occasional contact with supervisors, co-workers, and the public, which, if the ALJ accepted the VE's testimony, would render Mr. Masters disabled given the balance of the RFC. In explaining her change of mind – she now found that he was only *mildly* limited in terms of social functioning – the ALJ looked to the entire record and to Dr. Dawkins' testimony:

> As pointed out by the medical expert, the claimant did work, he attends to self-care and hygiene and he attends AA meetings which require social interaction. Furthermore, the claimant walks his dog and shops, thus, he is not isolative.

(R. 22).

20 C.F.R. Pt. 404, Subpt. P, App.1 §12.00(C)(2) states that social functioning includes the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords or bus drivers. The list is illustrative, not exhaustive. The regulation provides that impaired social functioning may be demonstrated by, *inter alia*, "social isolation."

Mr. Masters' chief quarrel with the ALJ's conclusion is that she ignored the opinion of Dr. Brister that Mr. Masters "would be moderately limited in his 'ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes.'" (*Memorandum in Support of Plaintiff's Motion*, at 8). The argument is mistaken; Dr. Brister said no such thing. Rather, he said that Mr. Masters was *not* significantly limited in his "ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes." (R.365). The "Moderately Limited" box on the form is not checked. (R. 365).

23

Mr. Masters' brief also contends that the ALJ does not mention Dr. Brister's opinion that Mr. Masters was *moderately* limited in the areas of ability to accept instructions and respond appropriately to criticism from supervisors. (R. 365). Ignored by Mr. Masters' brief is Dr. Brister's actual Functional Capacity Assessment in Section III, which required that he take into consideration the various ratings of mental functioning in Section I, where the moderately limited assessment appears. Dr. Brister's ultimate, and for present purposes, dispositive conclusion, was that taking the evaluations in Section I into account, Mr. Masters "should be able to maintain concentration to do simple tasks." (R. 366).

Mr. Masters also contends that the ALJ's basis for finding that he was not restricted in his ability to get along with others in a work setting was based entirely on his previous, several-month work stint, his regular attendance at twice weekly AA meetings, and walking his dog and shopping. (*Memorandum in Support of Plaintiff's Motion*, at 9). This, he insists, is an insufficient basis on which to rest the conclusion. First, the ALJ did not rely on dog-walking to show he could get along with others, but only to show he was "not isolative." (R. 22). The same is true for shopping and fishing. But regular attendance and successful participation in AA meetings (R. 564) – to this could be added participation in regular group therapy sessions (R. 474, *et seq.*) – is evidence that Mr. Masters had the ability to interact appropriately with others, at least at some basic level. That conduct has some significance as a predictor of the capacity to interact appropriately with people in a basic work setting.

Notably, Mr. Masters did not say he could not handle his prior work stint due to difficulties in dealing with the people he encountered or to difficulty interacting with people generally. Mr. Masters ascribed his difficulty to the production rate required, the exceedingly meticulous nature of the work involved, and the fact that he was working 10 to 12 hours a day. (R. 548, 567).

Mr. Masters also criticizes the ALJ for allegedly ignoring his assertions to Dr. Prinz that he was socially withdrawn. The ALJ did not disregard that fact. She simply concluded that the degree of limitation in this area was not as severe as Mr. Masters' counsel was claiming and that it would not preclude the kind of work that the VE said existed. Mr. Masters' argument assumes the truthfulness of his statements and thus begs the very question to be decided, namely his credibility. Moreover, a doctor's notation in his notes of a claimed symptom or subjective complaint from the patient is not medical evidence; it is the "the opposite of objective medical evidence." *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010). An ALJ is not required to accept the statement as true or to accept as true a physician's opinion based on those assertions. *Id. See also Ketelboater v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008); *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004). *See* discussion *infra* at 31. Otherwise, the hearing would be a useless exercise.

**b.**

Mr. Masters claims that the ALJ improperly discredited his testimony because she mistakenly believed that he testified to "sleeping all day," which is inconsistent with the daily activities in which Mr. Masters said he engaged. (*Memorandum in Support of Plaintiff's Motion*, at 10). In fact, all Mr. Masters said at the hearing was that he slept an

hour-and-a-half a day during the day. Based on the ALJ's supposedly incorrect view of his testimony, the ALJ's discrediting of his testimony was, Mr. Masters argues, reversible error. The problem with the argument is that its factual predicate is wrong.

The ALJ never said or thought that Mr. Masters testified that he "slept all day." In fact, she said that he testified that he "spends a lot of time sleeping during the day" because he says he is depressed and tires easily. (R. 24). Mr. Masters' counsel obviously thought that sleeping an hour and a half a day constituted "sleeping a lot," since he attempted to use that testimony to his advantage during his questioning of the VE in order to elicit the unsurprising testimony that a person who had to sleep that much during the day would be unemployable. It is certainly not inappropriate for the ALJ to have characterized Mr. Masters' napping the way she did, and Mr. Masters' brief raises no issue with that characterization. It is the ALJ's supposed misapprehension about "sleeping all day" that is at issue.

As the ALJ's opinion made clear, it was the medical expert, Dr. Dawkins, who said that the claimant's assertion of "sleeping all day" because of depression is "hard to imagine" based on her review of the medical records. (R. 24). Thus, the ALJ was not under a misapprehension about the duration of Mr. Masters' claimed daily naps, and she understood that Dr. Dawkins was speaking colloquially.

The ALJ also found that Mr. Masters' assertions about sleeping an hour and a half during the day were unsupported by the medical evidence and were not consistent with his regular attendance at twice-weekly AA meetings and group therapy sessions, (R. 24), the notes of which (R. 503-521) contain no statement by Mr. Masters about being too

tired or unfocused to work. In fact, they reflect Mr. Masters' avowed "determin[ation] to find employment" and to fill out applications for work at two companies whose names were provided by members of the group. (R. 503-504).

Significantly, Dr. Prinz's treatment notes reflect no complaint by Mr. Masters that he was too tired to work or that he had to nap on a daily basis. Moreover, Mr. Masters denied being fatigued when he was examined in April 2005 by Dr. Fernando. (R. 359). With the exception of his single statement to Dr. Nash in November of 2001, there seems to be no mention of debilitating fatigue or napping in the record, and Mr. Masters does not point to any in his brief. It is unlikely that a patient affected by any significant symptom would not mention it to his treating doctor and would have denied it to the consulting psychiatrist, whom he knew he was seeing in connection with the evaluation of his pending claim for disability benefits. (R. 26, 359). Thus, the ALJ could properly have concluded, as she did, that Mr. Masters' testimony that he took daily hour-and-a-half naps, was either untrue or exaggerated. *See Colon ex rel. Colon v. Commissioner of Social Security*, 411 Fed.Appx. 236 (11th Cir. 2011) (applicant failed to complain to her doctors about the side effect of medicine she was taking); *McCoy v. Astrue,* 2011 WL 3330504, 7 (8th Cir.2011)("McCoy's testimony that he could walk only fifty feet because of acute pain was inconsistent with record evidence indicating that, as late as July 2006, McCoy told the doctor he was mowing the lawn in the high heat. The ALJ did not err by discrediting some of McCoy's reported symptoms."); *Ridenbaugh v. Barnhart,* 57 Fed.Appx. 101, 105 (3rd Cir. 2003)(plaintiff's failure to complain of headaches when she filed her claim properly considered by ALJ); *Ruhl v. Bowen*, 710 F.Supp. 255, 259

(W.D.Mo. 1989)(plaintiff's failure to complain to her doctor about "drowsiness" warranted an adverse credibility determination); *Jackson v. Neuman,* 309 F.Supp. 697, 700 (D.C.La. 1970)("failure to complain about back pain tends to negate such an injury").

In addition to referring to Mr. Masters' attendance at twice-weekly AA meetings and group therapy sessions, the ALJ also referred to Mr. Masters cooking, shopping, doing laundry, doing the dishes, vacuuming, walking the dog, mowing the lawn, fishing, etc. – as further undermining his claim that he tired easily and thus could not work at all. (R. 24-25). While the Seventh Circuit has cautioned against putting too much reliance on restricted, daily activities as the basis for disbelieving a plaintiff's claim of disabling pain, *see e.g., Milliken v. Astrue*, 397 Fed.Appx. 218, 225, 2010 WL 4024908, 7 (7th Cir. 2010)(collecting cases), or for finding that he or she is able to work full time, those activities are relevant and must be considered under the Social Security regulations, which the ALJ explicitly discussed in her opinion. (R.24).

Another factor the ALJ looked to in making her credibility determination was Mr. Masters' testimony at the hearing that he stopped taking medicine because when he took it, he "didn't feel any different" than when he didn't. "It wasn't working at all and I've taken numerous medications in the past and nothing seems to be working or has worked in the past." (R.573). That testimony was flatly contradicted by and is at odds with the medical records, which reflected that Mr. Masters' condition *was* improved on medication and with his own statements reflected in those records that medicine had indeed been effective. (R. 25). *See* discussion *supra* at 3, 5-6, 8.

28

For example, Dr. Prinz's treatment note of his first meeting with Mr. Masters in July 2005 states that Mr. Masters has been taking Ritalin "with normal success." The problem was he has not been "consistent with taking medications." The note further states that Mr. Masters has been on Effexor, "but he is not taking it with consistency." (R. 397). Dr. Prinz determined that it was appropriate to continue with Ritalin and recommended adding Zoloft, (R. 398), which was one of the drugs that Mr. Masters reported to Dr. Fernando on April 11th he had been taking. Further, Mr. Masters "report[ed] [to Dr. Fernando at their meeting in April 2005] significant relief of symptoms by his prescribed psychotropic regimen," which has included Ritalin, Zoloft, and Effexor. (R. 359). And, Mr. Masters told Dr. Prinz at their last meeting in late 2007 that he very much wanted to "get back on" medicines – an odd request if, in fact, no medicine had ever worked, as he claimed at the hearing. (R. 526). In not one of the several statements by Mr. Masters to his various doctors over the years, did he ever say that medicine was too expensive and that as a consequence, he was non-compliant with his medical regimen.

As discussed earlier, *see supra* at 12, it was Mr. Masters' counsel's leading question that came after his unequivocal assertion to Dr. Dawkins that cost had played no role in his noncompliance with his prescribed medical regimen that he switched positions and said it was both cost and ineffectiveness of the drugs. The reason for the switch in positions is obvious. *Cf., Craft*, 539 F.3d at 679 ("In assessing credibility, infrequent treatment or failure to follow a treatment plan can support an adverse credibility finding where the claimant does not have a good reason for the failure or infrequency of

treatment."); *Schmidt*, 496 F.3d at 843 ("Schmidt has failed to establish that she suffers from her claimed level of chronic pain because her medical records indicate that she was able to keep her pain in check using various medicines, and that she did not follow through on her physical therapy or pursue pain management.").

But even if one were to credit Mr. Masters' contention that cost and effectiveness were involved in his episodic use of the medicines prescribed by his doctors, the fact remains that his testimony regarding ineffectiveness of the drugs was fundamentally inconsistent with and contradicted by the undisputed medical evidence, which consisted of his own repeated statements to his doctors that the drugs worked when he took them.

The significance of prior inconsistent statements in assessing credibility, *United States v. Lutz*, 153 F.3d 723 (4ᵗʰ Cir. 1998); *United States v. McGee*, 408 F.3d 966, 981-82 (7ᵗʰ Cir. 2005), is not less important in Social Security cases. It is for the ALJ to determine the significance of any particular inconsistency in light of the evidence in the case. The ALJ obviously thought the impeachment of Mr. Masters was significant, and it simply cannot be said that her determination was "patently wrong." That impeachment permitted, although it did not require, the ALJ to find that Mr. Masters' testimony in other areas was not wholly credible, *Kadia v. Gonzales,* 501 F.3d 817, 821 (7th Cir.2007), for a "willingness to lie" about one matter implies willingness to lie about others. *Decatur Ventures, LLC v. Daniel*, 485 F.3d 387, 391 (7ᵗʰ Cir. 2007); *Alsagladi v. Gonzales*, 450 F.3d 700, 701 (7ᵗʰ Cir. 2006).

The ALJ also pointed out (R. 25) that Mr. Masters worked – according to him for perhaps as much as eight months during 2005 and 2006 – during the time he claimed to

be unable to focus on tasks of any kind. (R. 567). That was the job that involved production quotas that he found overly stressful. (R. 567). The ALJ did not rely on this as proof of ability to work, *see Gentle v. Barnhart,* 430 F.3d 865, 867 (7th Cir. 2005), but as bearing on credibility and undermining his claims of needing daily naps and inability to focus for more than fifteen minutes on "anything." (R. 571). *See* SSR 96-8p (ALJ must consider attempts to work); *Williams-Overstreet v. Astrue*, 364 Fed.Appx. 271, 276-277, 2010 WL 431447, *5 (7th Cir. 2010).

An additional area of impeachment involved Mr. Masters' claim that he essentially was incapable of doing anything for himself, and that his mother had to take care of him. (R. 570).[8] The ALJ pointed out that Dr. Dawkins' review of the medical records revealed that Mr. Masters had never claimed that his mother takes care of him, but rather he just does not help her with chores, even though he appears capable of doing so. She also pointed out that Mr. Masters testified at the prior hearing that he moved back home for financial reasons; he did not contend that the reason for the move was that he needed to be taken care of by his parents. (R. 22).

Notably, the ALJ did not say that Mr. Masters' daily activities evidenced an ability to work full-time, regardless of the kind of job involved. But she did say that they called into question the claim that he was too tired during the day to work at all – because he had to nap daily.[9] But even if the ALJ overweighted Mr. Masters' daily activities in

---

[8]Mr. Masters testified that he did not even feed the dog or take the dog to the vet. He went on to say not only does his mother do all those kinds of things, but "[she] takes care of me actually." (R. 570).

[9]The ALJ incorporated Mr. Masters' stated problems with the production rate in his prior employment into her RFC finding, limiting him to work that did not involve production quotas. *See*
(continued...)

her credibility analysis, there remains what the ALJ concluded were the exaggerated or false claims about his tiredness and focus and the various other inconsistencies in his testimony discussed earlier. This is enough to validate the ALJ's conclusion and to render harmless any error in over-weighting the evidence related to daily activities. *Outlaw v. Astrue*, 412 Fed.Appx. 894, 898 (7th Cir. 2011).

In this case, it can be said with "great confidence" that the ALJ would not arrive at a different result in the event of a remand. *McKinzey*, 641 F.3d at 892. And "'[n]o principle of administrative law or common sense requires [a reviewing court] to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.'" *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989). *See also Illinois v. ICC*, 722 F.2d 1341, 1348 (7th Cir.1983).

Lastly, Mr. Masters faults the ALJ for not having expressly discussed the fact that the dosages of his medication were increased from time to time. This, he says, means that his "'symptoms are a source of distress to [him],'" *citing* SSR 96-7p. (*Memorandum in Support of Plaintiff's Motion*, at 12). But the ALJ did not doubt they were a source of distress. She found that Mr. Masters had a number of severe impairments that placed certain restrictions on him.

### c.

Mr. Masters' complaint that the ALJ failed adequately to consider Dr. Prinz's "opinion" in his November 2007 treatment note that Mr. Masters "continues to struggle

---

[9](...continued)
*Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir. 2010)(ALJ did not ignore or mischaracterize plaintiff's testimony when it was incorporated into the RFC finding).

with moods, energy, and concentration, and that he 'continues to struggle being able to focus on the job for any length of time'" is a nonstarter. (*Memorandum in Support of Plaintiff's Motion*, at 14). The brief carefully puts out of view not only the text of the note, but its context, which is the chief determinant of the meaning of all language. *See United Automobile, Aerospace & Agricultural Implement Works,* 523 U.S. 653, 657 (1998); Scalia, A Matter of Interpretation: Federal Courts and the Law, 135 (1997).

After noting that Mr. Masters was "seen today," Dr. Prinz wrote: "*Patient indicates* that he *has been* struggling a great deal with moods, energy and concentration." (R.526)(Emphasis supplied). The balance of the opening, six-line paragraph goes on to recount Mr. Masters' statement that although he has been sober over the last six months, "he has still struggled a great deal," and he "continues to struggle with being able to focus in on a job for any length of time." (R. 526).

The second paragraph further confirms the narrative nature of the note. Dr. Prinz wrote that "patient is currently residing with his parents and indicates that he is not functioning well. He has disturbed energy, disturbed concentration and has some heightened anxiety symptoms." Obviously, these are Dr. Prinz's terms, but they are based on Mr. Masters' statements. Dr. Prinz notes Mr. Masters' desire to "get on medications again." (R. 526). He concludes the introductory portion of the half-page note by stating that Mr. Masters is currently in an IOP program through LaSalle County and has done well with this as far as maintaining sobriety and going to AA meetings at least twice a week. (R. 526).

33

The ALJ did not err by failing to discuss these particular statements by Mr. Masters. It is a basic principle that a doctor's notation of a claimed symptom or subjective complaint from the patient is not medical evidence. *Schaaf*, 602 F.3d at 875. It is, as previously noted, the "the opposite of objective medical evidence." *Id*. Indeed, an ALJ is not compelled to accept a treating physician's opinion based on those assertions. *Id*. *See also Ketelboater*, 550 F.3d at 625 (ALJ can discount opinion of treating physician if based on the plaintiff's subjective complaints)*; Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004)("medical opinions upon which an ALJ should rely need to be based on objective observations and not amount merely to a recitation of a claimant's subjective complaints."); *Dixon*, 270 F.3d at 1177.

The second paragraph of the November 19, 2007 treatment note is captioned, "**Objective Mental Status Exam.**" (Bold-face in original). It consists of the terse observation that Mr. Masters' mood is sad/anxious, and his affect is appropriately related and his insight and judgment are fair. There is no suicidal or homicidal ideation and his thought processes are "coherent, logical and sequential." (R. 526).

When the actual words of the treatment note and the overall context of Dr. Prinz's statements are fairly read, there is nothing in the note that supports the inaccurate impression conveyed by Mr. Masters' brief that the words it quotes represent an "opinion" by Dr. Prinz and constituted "the most recent medical evidence prior to the hearing date...." (*Memorandum in Support of Plaintiff's Motion*, at 14). But even if these were Dr. Prinz's opinions, they are not different to what Dr. Prinz observed in his 2005 report. In fact, if anything, they are not as dire as the observations in that report.

34

Dr. Prinz's 2005 report to Mr. Masters' lawyer, which the ALJ did discuss and consider, is far more encompassing than the terse November 2007 treatment note. The former stated that Mr. Masters had sleep disturbance, decreased energy, difficulty concentrating, appetite disturbance, psychomotor retardation, and feelings of guilt. Under functional limitations, he appeared to check either "marked difficulties in maintaining concentration" and "repeated episodes of decompensation" – along with "marked difficulties in social functioning." (R. 396 ).

Since this report was discussed and addressed in the ALJ's decision, and since the November 2007 treatment note does not contain anything that would support a finding of disability under the Act, it is difficult to see how the ALJ's failure to discuss the 2007 note was error, let alone an error of such magnitude as to warrant a remand.

It is a misreading of the 2007 treatment note to call it "[i]n effect... an updated opinion that [Mr. Masters] continued to meet Listing 12.04 despite being sober for 6 months." (*Memorandum in Support of Plaintiff's Motion*, at 13). The note is far more positive that the 2005 report, and does not address the factors required to meet Listing 12.04 – marked restrictions in *two* areas, not just in concentration, 20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.04(B). It does not conclude or warrant the conclusion that the Listing has been met. Quite the contrary.

Mr. Masters' brief points out that the November 2007 note was discussed by Dr. Dawkins at the hearing as though that somehow supports the claim that the ALJ erred by not discussing it in her opinion. (*Memorandum in Support of Plaintiff's Motion*, at 13). Dr. Dawkins' reference to the treatment note was brought up by Mr. Masters' counsel

during his cross-examination, and the predicate of the question regarding the note – like the argument in the brief in this court – incorrectly attributed to Dr. Prinz the statements of Mr. Masters, as though they constituted Dr. Prinz's medical opinion. Thus, Mr. Masters' counsel asked Dr. Dawkins: "...yet in November of 2007 when [Dr. Prinz] saw [Mr. Masters] again he indicate [sic] that he's been struggling a great deal with moods, energy and concentration" and was unable to hold steady employment. (R. 583). When Dr. Dawkins sought to clarify the question and further inquired of Mr. Masters' counsel whether the "job" that was referred to in connection with the statement about inability to "hold steady employment," had ended in 2006 (it had – R. 567) – a job Dr. Dawkins pointed out she agreed was too tedious for Mr. Masters -- Mr. Masters' counsel abruptly ended the examination. (R. 584).

The record leaves no doubt that the ALJ did not ignore an entire line of evidence that supports the plaintiff's claim. *Terry*, 580 F.3d at 477; *Simila*, 573 F.3d at 517. Dr. Prinz's views were not ignored or inadequately considered. They were discussed in the ALJ's opinion, along with all the medical opinions and evidence in the case. The ALJ simply chose not to accord Dr. Prinz's pronouncements controlling weight and to give greater weight to the opinions of the other three medical professionals in the case, as she was clearly allowed to do. *See Ketelboater*, 550 F.3d at 625; *Schmidt*, 496 F.3d at 843.

Calling Dr. Prinz a "treating psychiatrist" does not aid Mr. Masters. (*Memorandum in Support of Plaintiff's Motion*, at 13). The opinions of "treating physicians" are not sacrosanct and immune from rejection. True enough, their opinions may be more informed because they have greater familiarity with the patient, having

36

treated them over time. *Punzio v. Astrue*, 630 F.3d 704, 713 (7th Cir. 2011); *Schmidt*, 496 F.3d at 842; *Hofslien,* 439 F.3d at 377. In the instant case, Dr. Prinz initially saw Mr. Masters in July and October, 2005. But that was only once more than did Dr. Fernando, who saw him in April 2005. Two more years would pass before he was again seen by Dr. Prinz in November 2007. (R. 526). Consequently, Dr. Prinz did not have much more to offer in terms of a "longitudinal view" than a consulting physician. *See Scheck v. Barnhart*, 357 F.3d 697, 702-03 (7th Cir. 2004).[10]

Cases in this Circuit make clear that a treating physician's assessment may be unreliable because of the bias he or she may bring to the disability evaluation. "'The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability.'" *Dixon,* 270 F.3d at 1177. In short, he may "'bend over backwards'" to help a patient obtain benefits. *Punzio*, 630 F.3d at 713. *See also Zeigler Coal Co. v. Office of Workers' Compensation Programs,* 490 F.3d 609, 616 (7th Cir. 2007). Here, that potential may have even been enhanced by virtue of the fact that Mr. Masters' sister was also a patient of Dr. Prinz. (R.397).

The Seventh Circuit has repeatedly reminded the district courts that a treating physician's opinion "'is not the final word on a claimant's disability,'" *Schmidt*, 496 F.3d at 842, and a claimant is not entitled to disability benefits "simply because [his] physician states that [he] is 'disabled' or unable to work." *Dixon*, 270 F.3d at 1177. In the end, "'it is up to the [ALJ] to decide which doctor to believe – the treating physician who has

---

[10] The Social Security regulations require the ALJ to consider, *inter alia*, the length, nature, and extent of the treatment relationship, frequency of examination. 20 C.F.R. § 404.1527(d)(2)); *Scott v. Astrue,* _F.3d._, 2011 WL 3252799, 5 (7th Cir. 2011).

experience and knowledge of the case, but may be biased, or...the consulting physician, who may bring expertise and knowledge of similar cases – subject only to the requirement that the [ALJ's] decision be supported by substantial evidence." *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1992); *Stephens v. Heckler,* 766 F.2d 284, 289 (7th Cir. 1985). So long as reasonable minds could differ concerning whether the claimant is disabled, we must affirm the ALJ's decision denying benefits. *Schmidt,* 496 F.3d at 842; *Farrell v. Sullivan*, 878 F.2d 985, 989 (7th Cir. 1989).

Under the circumstances of this case, the ALJ's refusal to give Dr. Prinz's opinion controlling weight was not error. What the court said in *Bauer v. Astrue,* 532 F.3d 606, 608 (7th Cir 2008) bears repeating:

> Equally obviously, once well-supported contradicting evidence is introduced, the treating physician's evidence is no longer entitled to controlling weight. At that point, "the treating physician's evidence is just one more piece of evidence for the administrative law judge to weigh.... The [treating-physician] rule goes on to list various factors that the administrative law judge should consider, such as how often the treating physician has examined the claimant, whether the physician is a specialist in the condition claimed to be disabling, and so forth. The checklist is designed to help the administrative law judge decide how much weight to give the treating physician's evidence. When he has decided how much actual weight to give it, there seems no room for him to attach a presumptive weight to it.

### d.

Finally, Mr. Masters argues that the ALJ ignored the ME's testimony that Mr. Masters had *marked* restrictions in activities of daily living and thus the ALJ "cherry-picked" those facts that were favorable to her decision. (Memorandum at 12; Reply Brief at 5). The cherry-picking, however, is to be found in Mr. Masters' brief, which carefully isolates a single statement by Dr. Dawkins from the  broader and informative context of

its utterance. By selectively quoting only a snippet of Dr. Dawkins' overall opinion, the brief is "quite misleading." *Walters v. National Association of Radiation Survivors*, 473 U.S. 305, 322 (1985).

The statement on which Mr. Masters' brief relies came only after Dr. Dawkins, who observed Mr. Masters' testimony at the hearing and questioned him, said that she could not understand from that testimony what exactly it was that Mr. Masters did all day. In her words, "it was very difficult to get a good description of his day-to-day activities." She went on to say, apparently accepting as true whatever she understood him to be saying, that in terms of activities of daily living he was markedly impaired. (R. 579).[11] She went on to say that given Mr. Masters' various impairments – some of which were severe – and based upon her review of the medical records, it was her opinion that Mr. Masters "is capable of or retains the mental capacity to do simple, unskilled work where production, or weight of production or speed is not a factor...." (R. 580).[12] Dr. Dawkins was quite clear that Mr. Masters could do that kind of work "and sustain that over the course of a normal work day and over a period of, of [sic] time." (R. 580).[13]

On cross-examination by Mr. Masters' counsel, Dr. Dawkins said that the jobs Mr. Masters could perform were consistent with his mental capacity, and that if the task was a

---

[11] Obviously, if that testimony were discredited, as it ultimately was by the ALJ, her conclusion would be different.

[12] That eliminated any factory type of work.

[13] It will be recalled that on his 2005 report to Mr. Masters' counsel, Dr. Prinz checked "no" to the question of whether Mr. Masters was able to function in a "*competitive* work setting (not a sheltered workshop position) on an *eight hour per day, five days per week basis*." (R. 394)(Emphasis supplied)(parenthesis in original). No question was asked about capacity to work in a less stressful, less demanding, basic work setting, involving simple tasks. (R. 362).

39

passive one, he would be able to focus on the task. (R. 582-83). Dr. Dawkins also explicitly disagreed with Dr. Prinz and explained why. (R. 583-84). None of this is mentioned in Mr. Masters' brief.

In any event, it is not entirely clear what the point of the argument is. A *marked* limitation in one area is not enough to meet the Listing, and Dr. Dawkins' *full* opinion was that Mr. Masters could perform work that did not entail a production quota – an opinion which the ALJ adopted. The ALJ did not have to adopt every portion of the ME's opinion, *see Haynes v. Barnhart*, 416 F.3d 621, 631 (7th Cir. 2005), and she explained why she felt Mr. Masters had only moderate restrictions in his daily activities. At worst, because a finding of *marked* restrictions would not have changed the ultimate outcome or affected Dr. Dawkins' opinion that Mr. Masters could work at a basic level, the ALJ's apparent rejection of the isolated portion of her opinion that there was a market limitation even if error is harmless. *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004); *Keys v. Barnhart,* 347 F.3d 990, 994-95 (7th Cir. 2003).

## CONCLUSION

Cases involving claimed psychological impairments are perilous for Administrative Law Judges. *See e.g., Spiva v. Astrue*, 628 F.3d 346, 348 (7th Cir. 2010); *Rohan v. Chater*, 98 F.3d 966, 970-71 (7th Cir. 1996). They are called on to resolve conflicts in expert testimony, while not substituting their judgment for that of medical professionals. *Rohan*, 98 F.3d at 970-71. In this case, the ALJ did that in a reasoned and careful way. Her assessment of Mr. Masters' credibility accorded with the applicable regulations and with those evidentiary principles that long experience and common sense

have taught are fair evaluators of truthfulness. Her conclusions being supported by "substantial evidence" and her credibility assessments not being "patently wrong," the Commissioner's motion for summary judgment is GRANTED, and Mr. Masters' motion for summary judgment is DENIED.

**ENTERED:** _____

UNITED STATES MAGISTRATE JUDGE

**DATE:** 8/19/11